UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
JONATHAN PESCE,                        :        12cv8663 (DLC)
                                       :
                    Plaintiff,         :        OPINION AND ORDER
                                       :
        -v-                            :
                                       :
THE NEW YORK CITY POLICE DEPARTMENT,   :
THE CITY OF NEW YORK, ET AL.,          :
                                       :
                    Defendants.        :
                                       :
-------------------------------------- X

APPEARANCES:

For the plaintiff Jonathan Pesce:
Bradford D. Conover
Conover Law Offices
345 Seventh Ave., 21st Floor
New York City, NY 10022

For the defendants:
Donna A. Canfield
Gloria M. Yi
Ricardo Tapia, Jr
New York City Law Dept.
100 Church Street
New York, NY 10007

DENISE COTE, District Judge:

     This dispute arises out of the determination by the New

York Police Department ("NYPD") that plaintiff Jonathan Pesce

("Pesce") is medically disqualified from serving as a police

officer on account of having a seizure condition and taking

anti-convulsant medication.  Pesce has sued the NYPD, the City

of New York, NYPD surgeon Dr. Eli Kleinman, and former NYPD

Commissioner Raymond Kelly,[1] contending that the decision not to hire him violated the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and the New York City Human Rights Law ("NYCHRL").

For the reasons that follow, the motion for summary judgment is denied, with one exception.  The claims against the NYPD are dismissed.

## Background

The following facts are undisputed, unless otherwise noted.

### I.  Pesce's Medical History

Pesce's first seizure occurred in October 2000, when he was twelve years old.  While playing a video game, he experienced a visual disturbance and then lost consciousness.  Pesce was non-responsive for approximately thirty minutes during that episode, and was lying on his side, drooling, and grinding his teeth.  Pesce was transported to the Schneider Children's Hospital for treatment.[2]

Pesce experienced a second seizure a year later, in October 2001.  Similar to the first seizure, the second episode occurred

---

[1] Raymond Kelly is no longer the NYPD Commissioner.  Because Pesce has sued Raymond Kelly in his official capacity, the current Commissioner, William Bratton, will be substituted as a party automatically.  Fed. R. Civ. P. 25(d).

[2] Schneider Children's Hospital is currently known as the Steven and Alexandra Cohen Children's Medical Center of New York.

while, or shortly after, Pesce had been playing a video game. During that time, Pesce was non-responsive for 25 to 30 minutes. He was again transported to the Schneider Children's Hospital for treatment.

Pesce experienced a third seizure on November 2, 2001, and was again taken to Schneider Children's Hospital.  The circumstances and symptoms of this episode were substantially similar to the first two seizures that Pesce experienced. Following the third seizure, Pesce was prescribed the anticonvulsant medication Depakote, in the amount of 125 milligrams, to be taken three times daily.  After starting on Depakote, Pesce made several follow-up visits with Dr. Lydia Eviatar, a pediatric neurologist.  He also received EEGs, MRIs, and a CAT scan.

In October 2003, Pesce's neurologist recommended that Pesce stop taking Depakote for a period of time to determine if the seizures had been isolated events.  Pesce may have experienced seizures in 2004 and/or 2005, although he testified that he was not certain.  Pesce was again seen by a neurologist in April of 2005.  Pesce experienced additional seizures, while still off anticonvulsant medication, in September and November of 2007, and again in March of 2008.  In 2008, Dr. Kenneth Chao ("Dr. Chao") diagnosed Pesce's seizure as "GTC" or generalized tonic clonic.  At that time, Pesce was placed back on the medication

Depakote.  Pesce currently takes approximately 500 milligrams of
Depakote twice a day, once in the morning and again in the
evening.  Pesce has not experienced a seizure since restarting
his medication, and according to Pesce's expert witness, Doctor
Sheryl Haut, M.D. ("Dr. Haut"), Pesce's epilepsy has been
"completely controlled" for the past seven years.  Pesce
continues to be seen by Dr. Chao annually for check-ups.

## II.  Pesce's Personal Background

After restarting his anticonvulsant regimen, Pesce has
served since 2008 as a volunteer firefighter with the Massapequa
Fire Department and has obtained "Class A" designation, meaning
he was found medically qualified and fit for all duties.  In
addition to being a firefighter, Pesce is also a paramedic.  As
part of his responsibilities as a firefighter, Pesce was on
several occasions required to be on stand-by in the firehouse
for a period of 24 hours, and also participated in a high volume
of calls, especially during Hurricanes Sandy and Irene.

Pesce is the holder of a Class D New York driver's license.
Because of his history of seizures, Pesce was initially required
to submit medical documentation showing that a doctor
recommended that he be permitted to drive a vehicle.  In January
of 2009, Dr. Chao signed a DMV document (Form MV-9OU.1) stating
that, in his professional opinion, Pesce's condition would not
interfere with the safe operation of a motor vehicle.  Pesce was

initially required to submit follow-up documentation from his doctor on an annual basis, but this requirement ended in May of 2011.  New York DMV regulations deem a driver fit for licensing if they have not experienced a loss of consciousness in the last twelve months.  15 CRR-NY 9.3.  Pesce regularly drives both his personal vehicle as well as fire trucks and ambulances.

In 2013, Pesce became licensed as a paramedic and has worked since 2014 as a paramedic for Hunter Ambulances.  Pesce also continues to serve as a volunteer firefighter.

**III. Pesce's Application to the New York Police Department**

On or about October 18, 2008, Pesce took the civil service competitive examination for the position of police officer with the NYPD.  After receiving the results of his exam -- a score of 89.411 -- Pesce appeared at the NYPD Medical Bureau on January 20, 2010 for a mandatory medical examination.  Upon arrival at the medical examination, Pesce completed an "Applicant's Medical Questionnaire" (the "Questionnaire").  On the Questionnaire, Pesce indicated "yes" in response to a question about whether he had ever had epilepsy.  He also noted that he had experienced a seizure in 2004 and that he was taking the medication Depakote.

After completing the Questionnaire, Pesce was asked questions regarding his seizure condition.  It is unknown whether the person questioning Pesce was a doctor, but Pesce testified that he did not believe the individual was a doctor

because he was not wearing clothing typical of a doctor.  Pesce explained that he had a seizure condition and that he took anticonvulsant medication.  After some time, another individual gave Pesce a disqualification notice, which stated that Pesce was disqualified for the reason of having seizures.

Two NYPD physicians were involved with the initial decision to medically disqualify Pesce.  Doctor David Lichtenstein, M.D. ("Dr. Lichtenstein") was deputy chief surgeon in charge of candidate testing.  His area of specialization is internal medicine.  Dr. Lichtenstein signed the document medically disqualifying Pesce, although he did not personally examine or meet Pesce at that time.  Dr. Lichtenstein's supervisor was Doctor Eli Kleinman, M.D. ("Dr. Kleinman"), whose title was supervising chief surgeon and whose area of specialization is internal medicine and hematology.  Dr. Kleinman's role was to make fitness-for-duty determinations for the NYPD.  Dr. Kleinman conferred with Dr. Lichtenstein in determining that Pesce was medically disqualified, but neither personally examined nor met Pesce at that time.

**IV.  Pesce's Medical Appeal Process**

On January 28, 2010, Pesce submitted a letter appealing his disqualification to the New York City Civil Service Commission ("CCSC").  In the letter, Pesce stated that his seizure condition was "completely controlled" with medication and that

6

he had never experienced a seizure while on medication, even
while playing video games.  He further stated that he had been
issued a New York driver's license and experienced no side
effects from his medication.  Lastly, Pesce stated that there
was no basis to disqualify him and that his disqualification ran
afoul of the ADA because he did not represent even the slightest
threat to the police department.  In support of his appeal,
Pesce also attached a letter from Dr. Chao stating that "[Pesce]
had had a seizure disorder which has been under control with
medication for about 2 years.  [Pesce] may serve in the police
department but should avoid excessive sleep deprivation."

Doctor Anthony G. Maniscalco, M.D. ("Dr. Maniscalco"), a
district surgeon for the NYPD and a neurologist, was appointed
to review Pesce's appeal.  As part of his review of Pesce's
appeal, Dr. Maniscalco reviewed Pesce's medical records from
Schneider Children's Hospital and from Dr. Chao.  Maniscalco
noted Pesce's abnormal EEG taken in November of 2001 and that
Pesce had experienced a seizure while temporarily off his
medication in 2008.  Dr. Maniscalco also noted that Pesce was
taking the medication Depakote.  Dr. Maniscalco did not confer
with Dr. Chao concerning Pesce's condition.

After reviewing Pesce's records, Dr. Maniscalco determined
that Pesce was medically unfit to enter the police academy.  The
basis for Dr. Maniscalco's determination was that Pesce had

epilepsy and was taking anticonvulsant medication.  Dr.
Maniscalco testified that he was not sure if he reviewed Dr.
Chao's note during his review of Pesce's file, but that even if
he had, he would have given no weight to Dr. Chao's
determination that Pesce was fit for police duty.  This was
because, in Dr. Maniscalco's view, Dr. Chao "doesn't understand
the duties of a police officer" and wrote "in ignorance of what
the job description entails."

Dr. Maniscalco testified that he believed that if an
individual has epilepsy and is on anticonvulsant medication,
then that individual cannot be qualified to be a police officer.
Dr. Maniscalco explained that a police officer is required to
operate a vehicle and carry a firearm, and must be in control of
his weapon at all times.

By a letter dated November 5, 2010, Dr. Kleinman requested
that the CCSC affirm the NYPD's determination that Pesce was
unqualified to serve as a police officer.  The letter stated
that "[i]t was revealed . . . that Mr. Pesce had a history of
seizures and is on Depakote, a medication for treatment of
epilepsy and used for seizures."  The letter further stated that

> [p]ersons with seizure disorders, maintained on
> anticonvulsant medication for seizure control, such as
> Mr. Pesce, may develop fluctuating blood levels of
> their medication due to various factors.  Seizures can
> occur due to the lowering of the seizure threshold as
> a result of low anticonvulsant levels in the blood
> stream resulting from stress, inconsistent dietary or

alcohol intake, interaction with other medication and
many other variables.  The myriad of essential
functions of a police officer, which include carrying
of firearms and the operation of emergency vehicles,
are precluded by such variability.  Consequently,
officers taking such medication pose a potential
hazard to themselves and the public.

On December 8, 2011, the CCSC affirmed the decision of the NYPD.

## V.   The Parties' Contentions Concerning Pesce's Fitness to Serve as a Police Officer

The parties dispute whether Pesce, who has a history of
seizures and who is on anticonvulsant medication, is medically
qualified to serve as a police officer in the NYPD.  Pesce has
introduced the declaration of his neurologist, Dr. Chao, who is
affiliated with Winthrop University Hospital and Advanced
Neurological Services of Long Island.  Dr. Chao states that "Mr.
Pesce's epilepsy has been completely controlled for the past 7
years, and has been controlled on medication for the full nine
years he has been taking medication (Depakote)."  Dr. Chao
further states that "[i]t is my professional medical opinion
that [Pesce] is fully capable of performing all of the duties of
a police officer, with no need of a reasonable accommodation,
just as he was on the date that he was disqualified by the
NYPD."  Finally, Dr. Chao states that he does "not believe there
was a reasonable medical basis to disqualify Mr. Pesce from the
NYPD on the basis of his history of epilepsy or taking anti-
seizure medication."

9

Pesce also relies on the declaration of an expert witness, Doctor Sheryl Haut, M.D. ("Dr. Haut").  Dr. Haut specializes in the diagnosis and treatment of epilepsy and currently serves as the Director of Adult Epilepsy at Montefiore Medical Center and Albert Einstein College of Medicine.  Dr. Haut concludes that "Mr. Pesce's epilepsy has been completely controlled for 7 years.  It is my professional medical opinion that he is fully capable of performing all of the duties of a police officer, with no need of a reasonable accommodation, just as he was on the date that he was disqualified from the NYPD."  Dr. Haut further states that she "strongly feel[s] that [Pesce] should not have been disqualified from the NYPD on the basis of his history of epilepsy or taking anti-seizure medication."  She states that police departments in other large cities, such as Houston, Texas, permit applicants to be on anti-convulsant medication if they have been seizure-free for at least a year.

Defendants rely on the deposition testimony of Drs. Lichtenstein, Kleinman, and Maniscalco, who all state that they believe Pesce is medically unfit to serve as a police officer because he is on anticonvulsant medication.  Dr. Lichtenstein testified that taking anti-seizure medication is an absolute bar to becoming a police officer unless it was an "obvious short-term issue."  Dr. Lichtenstein further testified that, based on Pesce's medical record, he would not be medically qualified to

serve even as a 911 operator due to the risk of seizure while
working.  Dr. Kleinman testified that there is no safe way for a
person to serve as a police officer while being maintained on
anticonvulsant medication because "you cannot predict whether or
not somebody will or will not have a seizure even on
medication," and that the mission of the NYPD "is to protect the
public and the individuals that work for them."  Finally, Dr.
Maniscalco testified that "if [a candidate is] on anticonvulsant
medications, I don't believe that they can be qualified to be a
police officer."

In addition to generally disputing Pesce's fitness to be a
police officer, the parties dispute several specific issues
relating to Pesce's epilepsy condition and how it could affect
his ability to perform the responsibilities of a police officer.
These disagreements are too numerous to list exhaustively, but
the major disputes are: (1) whether persons being treated for
epilepsy are more susceptible to provoked seizures, such as
those caused by head trauma; (2) whether, and to what extent,
diet, moderate alcohol consumption, and other medications affect
the efficacy of anti-convulsant medications, such as Depakote;
(3) whether Pesce has photosensitive epilepsy, such that he
could experience a seizure in response to flashing lights or
other visual stimuli; (4) whether a patient such as Pesce would
ordinarily be taken off anti-convulsant medication after a

certain period of time, or rather, remain medicated indefinitely; (5) the likelihood that Pesce will experience a seizure in the future if he remains on anti-convulsant mediation, which is known as a "breakthrough seizure;" and (6) the extent and significance of the side effects of Depakote, including tremor.

## VI.  The NYPD's Policies Toward Epileptic Applicants

Neither party has introduced evidence of a formal, written policy of the NYPD concerning when or whether a candidate with a history of epilepsy or seizures may be deemed medically qualified for the position of police officer.  Dr. Kleinman testified that there are no formal rules but that there are general guidelines.  Drs. Lichtenstein, Kleinman, and Maniscalco all testified, however, that a candidate who is taking anticonvulsant medication is deemed medically unfit for duty as a police officer.  Each of those doctors expressed a different opinion as to how long a candidate must be seizure-free before being deemed medically qualified.  Dr. Kleinman testified that a person with a seizure disorder could never serve as a police officer because it is impossible to predict if that person will have a seizure.  Dr. Lichtenstein testified that

> [i]f someone has had no seizures in the past five or
> ten years and they have a consistent level of their
> antiseizure medication and they're totally
> asymptomatic and have no other medical issues, then
> it's reasonable to assume that they're never going to

have another seizure as long as they're on their
seizure medication and they tolerate their antiseizure
drug.

He went on to say, however, that such a candidate would
still be medically unfit because a police officer could be
exposed to violent confrontations, head trauma, sleep
deprivation, or visual stimuli, and these could all make a
seizure more likely. Finally, the City of New York
submitted a position statement to the EEOC on behalf of the
NYPD stating that "[f]or candidates with a history of
seizure disorders, the Department generally requires that
the candidate be seizure-free for five years, and
medication-free for one year."

## VII. Procedural Background

On November 28, 2012, Pesce filed the instant suit,
alleging that he was disqualified from employment in the NYPD in
violation of the ADA, 42 U.S.C. §12101 et seq.; Section 504 of
the Rehabilitation Act, as amended, 29 U.S.C. § 794 et seq.; and
the NYCHRL, § 8-101 et seq. Defendants submitted their answer
on March 10, 2013, and following the completion of discovery,
moved for summary judgment on April 28, 2015. The motion was
fully submitted on August 24. This case was reassigned to this
Court on January 14, 2016.

## Discussion

Summary judgment may not be granted unless all of the

13

submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Smith v. Cty. of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. Eastman Kodak Co. v. Image Tech. Servs.,Inc., 504 U.S. 451, 456 (1992); Gemmink v. Jay Peak Inc., 807 F.3d 46, 48 (2d Cir. 2015). "[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004) (citation omitted).

Once the moving party has asserted facts showing that the non-movant's claims or affirmative defenses cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009)

(citation omitted); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## I.   Americans with Disabilities Act

Defendants make three principal arguments in support of their motion for summary judgment.  First, they argue that there is no genuine dispute of material fact that Pesce is not qualified to perform the essential functions of a police officer.  Second, they argue that even if there is a genuine dispute as to Pesce's qualifications, Pesce has not shown that the NYPD lacked a legitimate business reason for refusing to hire him.  Finally, defendants argue that they are entitled to summary judgment on their affirmative defense that Pesce would pose a threat to the health and safety of others.

### A.  Prima Facie Case

The ADA provides that "[n]o covered entity shall

discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A claim for disability discrimination under the ADA is generally subject to the burden-shifting analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this framework,

> [t]o establish a prima facie case under the ADA, a
> plaintiff must show by a preponderance of the evidence
> that: (1) his employer is subject to the ADA; (2) he
> was disabled within the meaning of the ADA; (3) he was
> otherwise qualified to perform the essential functions
> of his job, with or without reasonable accommodation;
> and (4) he suffered adverse employment action because
> of his disability.

McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013) (citation omitted).  Defendants do not dispute the first, second, or fourth elements.  Thus, the only element of the prima facie case in dispute is whether Pesce was qualified to perform the essential functions of a police officer at the time of his application.

The ADA does not define "essential function" of a job, but EEOC regulations provide that

> evidence of whether a particular function is essential
> includes, but is not limited to: (i) The employer's
> judgment as to which functions are essential; (ii)
> Written job descriptions prepared before advertising

16

or interviewing applicants for the job; (iii) The
amount of time spent on the job performing the
function; (iv) The consequences of not requiring the
incumbent to perform the function; (v) The terms of a
collective bargaining agreement; (vi) The work
experience of past incumbents in the job; and/or (vii)
The current work experience of incumbents in similar
jobs.

29 C.F.R. § 1630.2(n).  In determining the essential functions

of a job, a court must "give considerable deference to an

employer's determination as to what functions are essential,"

but also "conduct a fact-specific inquiry into both the

employer's description of a job and how the job is actually

performed in practice."  McMillan, 711 F.3d at 126 (citation

omitted).  The parties agree that the duties of a police officer

include, inter alia, the ability to intervene in various crimes

in progress; working outdoors and in all types of weather;

working weekends, nights, and holidays; driving a patrol car;

pursuing and restraining suspects; engaging in hand-to-hand

struggles; and using a firearm.

     The ADA defines "qualified individual" as "an individual

who, with or without reasonable accommodation, can perform the

essential functions of the employment position that such

individual holds or desires."  42 U.S.C. § 12111(8).  The

plaintiff bears the burden of production and persuasion on the

issue of whether he is otherwise qualified to perform the

essential functions of a job.  Borkowski v. Valley Cent. Sch.

Dist., 63 F.3d 131, 137 (2d Cir. 1995).  A plaintiff must show that he can perform the essential functions without accommodation or "suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." McMillan, 711 F.3d at 127 (citation omitted).  "[T]he inquiry essentially boils down to examining what conduct is symptomatic of the handicap, what conduct the job in question requires, and how these two interact." D'Amico v. City of New York, 132 F.3d 145, 151 (2d Cir. 1998).  In making this judgment, the fact-finder must consider "the consequences of a potential mishap." Id.

Defendants have failed to establish that there is no genuine dispute of material fact as to Pesce's qualification to be a police officer.  The only proffered basis for disqualifying Pesce is that he has a seizure condition and is taking anticonvulsant medication.  Defendants have offered the testimony of three doctors, stating that any candidate, including Pesce, who has a seizure condition and who is taking anticonvulsant medication, is medically disqualified from being a police officer.  Pesce has offered the declarations of his personal neurologist, as well as that of neurologist and expert witness, Dr. Haut, who both conclude that Pesce is qualified to perform all the duties of a police officer.

In addition to their differing conclusions, the doctors for

both parties dispute a wide range of facts concerning Pesce's condition and the likelihood that he will experience a seizure in the future.  For example, the parties dispute (1) whether Pesce's condition makes it more likely that he would experience a seizure in response to suffering head trauma, (2) whether fluctuations in sleep and diet could affect Pesce's medication levels, (3) whether Pesce's epilepsy condition is the type in which Pesce could experience a seizure in response to visual stimuli such as flashing lights, (4) whether the normal course of treatment for Pesce's condition would include eventually taking Pesce off Depakote, (5) the likelihood that Pesce will experience a "breakthrough seizure" despite being on anti-convulsant medication, and (6) the type and intensity of side effects Pesce experiences from his medication, Depakote.  These disputes all bear on whether Pesce is likely to experience a seizure in the line of duty, which is the central question concerning his qualification to be a police officer.  Viewing these facts in the lift most favorable to Pesce, a reasonable trier of fact could find that Pesce is qualified to perform the essential functions of a police officer, and this genuine dispute of material fact precludes summary judgment.

Defendants argue that the risk that Pesce will experience a seizure in the future is sufficient to establish that Pesce is unqualified to be a police officer, relying on D'Amico v. City

of New York, 132 F.3d 145 (2d Cir. 1998).  In that case, the
Court of Appeals affirmed summary judgment for the City of New
York after the New York Fire Department fired an employee who
was addicted to cocaine.  Id. at 151.  Defendants' reliance on
D'Amico is unavailing because D'Amico tested positive for
cocaine while he was employed at the fire department, and
admitted that he continued to use cocaine after he was fired.
Id. at 148, 151 n.4.  Here, at the time of his application,
Pesce had not experienced a seizure for over two years, and has
never experienced a seizure while on anti-convulsant medication.
In addition, D'Amico did not offer medical evidence that he was
no longer addicted to cocaine or unlikely to relapse.  Pesce has
offered evidence that his epilepsy is fully controlled with
medication and that he is unlikely to experience a seizure while
he remains on his medication.

**B. Legitimate Non-Discriminatory Reason**

Defendants argue that the NYPD's determination to
disqualify Pesce was based on a legitimate non-discriminatory
reason.  Generally, once a plaintiff has established a prima
facie case, the defendants may offer evidence of a legitimate
non-discriminatory reason for the adverse action, which shifts
the burden on the plaintiff to show that the proffered reason is
pretextual.  Cortes v. MTA New York City Transit, 802 F.3d 226,
231 (2d Cir. 2015).  When, as here, the parties agree that the

plaintiff's disability is the cause of the adverse action, there is no need to evaluate whether the adverse action was pretextual.  McMillan, 711 F.3d at 129.  There is no dispute that Pesce was deemed medically disqualified on the basis of his epilepsy condition and his use of anti-convulsant medication, and therefore there is no need to analyze whether his disqualification was a pretext to disqualify him on that basis. For this reason, the cases relied upon by the defendants are inapposite because they involve situations in which the employer identified a legitimate basis for the adverse action distinct from the employee's disability.  See Cameron v. Cmty. Aid For Retarded Children, Inc., 335 F.3d 60, 62 (2d Cir. 2003) (plaintiff fired for lacking required managerial skills); Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 99 (2d Cir. 2001) (hired applicant performed better during interview than plaintiff).  Accordingly summary judgment will not be granted on this basis.

### C. Blanket Policy Disqualifying Candidates with Epilepsy and Affirmative Defense of Direct Threat to the Health or Safety of Others

Pesce argues that the policy of the NYPD of excluding candidates with a seizure disorder and who are taking anticonvulsant medication is per se discriminatory because it does not give an individualized assessment of every candidate's qualifications to serve as a police officer.  Although neither

party has offered evidence of a formal policy, Drs.
Lichtenstein, Kleinman, and Maniscalco all testified that they
consider a candidate with epilepsy and on anticonvulsant
medication to be categorically disqualified.  Thus, there is a
genuine dispute of material fact as to whether the NYPD had a
policy that "tend[s] to screen out an individual with a
disability or a class of individuals with disabilities."  42
U.S.C. § 12112.

    In response, defendants raise the affirmative defense that
employing police officers with epilepsy and on anticonvulsant
medication would pose a direct threat to the health and safety
of others.  See 42 U.S.C. § 12113; Chevron U.S.A. Inc. v.
Echazabal, 536 U.S. 73, 78 (2002) (recognizing the affirmative
defense of threat to health and safety of others).  This defense
applies when a defendant has applied a blanket policy that tends
to exclude a group of people on the basis of disability, and the
party argues that such policy is job-related and consistent with
business necessity.  42 U.S.C. § 12112(b)(6).  In support of
this defense, defendants restate the same arguments they
advanced for why they believe Pesce is medically unfit to be a
police officer.  For the same reasons as discussed above,
defendants have failed to establish that there is no genuine
dispute of material fact concerning whether Pesce is likely to
experience a seizure if he were employed as a police officer and

pose a direct threat to the health and safety of others.  Thus, summary judgment cannot be granted on the basis of this affirmative defense.

Defendants argue that Pesce's "self-serving disagreement" with the NYPD's doctors does not establish that Pesce was capable of performing the essential duties of a police officer. Defendants rely on Bragdon v. Abbott, 524 U.S. 624 (1998), for the proposition that a good faith belief, grounded in medical and other objective evidence, prohibits a finding of disability discrimination.  Defendants' reading of Bragdon is incorrect. In that case, the lower courts granted summary judgment in favor of an HIV-positive plaintiff who sued a dentist for refusing to fill a cavity unless the plaintiff agreed to have the operation performed in a hospital at her own expense.  The Supreme Court held that the existence of a threat to health or safety must be determined with reference to medical or other objective evidence, and the defendant's subjective belief in a threat is insufficient.  Id. at 649.  The Court remanded the case to the Court of Appeals to determine if a review of medical evidence introduced by the parties altered its "conclusion that petitioner presented neither objective evidence nor a triable issue of fact on the question of risk."  Id. at 655.  Bragdon does not, as defendants suggest, hold that by introducing any objective medical evidence, a defendant is entitled to summary

23

judgment.   Rather, <u>Bragdon</u> confirms that in deciding a motion for summary judgment, the Court must examine the medical and other objective evidence presented by the parties.   As discussed above, the parties have offered conflicting medical evidence as to whether Pesce would be a threat to the health and safety of others if he were to serve as a police officer.   Accordingly, defendants are not entitled to summary judgment on this affirmative defense.

## II.   Rehabilitation Act

The standards for employment discrimination under the Rehabilitation Act are generally identical to those for the ADA. 29 U.S.C. § 791(g); <u>Henrietta D. v. Bloomberg</u>, 331 F.3d 261, 272 (2d Cir. 2003).   Accordingly, the analysis of Pesce's ADA claims discussed above is adopted with respect to his Rehabilitation claims as well.

## III. New York City Human Rights Law

The standards for employment discrimination under the NYCHRL are generally similar to those under the ADA.   The statutes differ with respect to their definition of a disability.   <u>Compare</u> 42 U.S.C. § 12102(1) <u>with</u> NYC Administrative Code 8-102.   Because the parties do not dispute that Pesce is disabled within the meaning of both statutes, this distinction is not relevant.   Whether an applicant is "otherwise qualified" under the NYCHRL is analyzed in parallel to the ADA.

See <u>Kinneary v. City of New York</u>, 601 F.3d 151, 158 (2d Cir. 2010).  Accordingly, the analysis of Pesce's ADA claims discussed above is adopted with respect to his NYCHRL claims as well.

## IV.  NYPD Defendant

Pesce has sued the NYPD directly in addition to suing the City of New York.  The New York City Charter states: "all actions and proceedings for recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law."  N.Y. City Charter § 396; <u>see also</u> <u>Jenkins v. City of New York</u>, 478 F.3d 76, 93 n.19 (2d Cir. 2007) (holding that the NYPD is a non-suable entity).  In addition, Pesce failed to oppose this aspect of defendants' motion and has thus abandoned his claims against the NYPD.  Accordingly, summary judgment will be granted for all claims against the NYPD.

## V.    Individual Defendants

Defendants argue that the claims against Dr. Kleinman and Raymond W. Kelly must be dismissed because claims against individuals are not permitted under the ADA or Rehabilitation Act.  Because Pesce seeks injunctive relief and has sued these individuals in their official capacities, these claims may proceed.  <u>Harris v. Mills</u>, 572 F.3d 66, 72 (2d Cir. 2009) ("Title II [of the ADA] and Rehabilitation Act suits for

prospective injunctive relief may, under the doctrine established by <u>Ex parte Young</u>, 209 U.S. 123 (1908), proceed against individual officers in their official capacity.")

### <u>Conclusion</u>

The defendants' April 28, 2015 motion for summary judgment is denied, with the exception that the claims against the NYPD are dismissed.


Dated:    New York, New York
          February 5, 2016


                              _____
                                      DENISE COTE
                         United States District Judge